**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BUILDING & CONSTRUCTION | ) | CASE NO. 1:09-cv-01825 |
| LABORERS LOCAL UNION NO. 310, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| Plaintiff, | ) | |
| | ) | **UNIVERSITY HOSPITALS HEALTH** |
| v. | ) | **SYSTEM, INC.'S OPENING BRIEF** |
| | ) | |
| ROMA DESIGN, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## I.  INTRODUCTION

In July 2009, Building & Construction Laborers Local Union No. 310 ("Local 310") filed a verified complaint and request for a temporary restraining order in state court seeking to enjoin the current and future work of Roma Designs LLC ("Roma") and to compel Roma to become a signatory to Local 310's Trade Agreement.  Local 310's complaint is based on a strained reading of two provisions of a project labor agreement (the "PLA") between University Hospitals Health System, Inc. ("UH") and the Cleveland Building and Construction Trades Council (the "Council").  Recognizing the threat of delayed work on its various construction projects caused by Local 310's requested injunction and the danger in Local 310's self-serving reading of the PLA, Defendant/Intervenor University Hospitals Health System, Inc. ("UH") intervened in this matter after it was removed to this Court.

In response to this Court's request, UH now submits this Opening Brief in support of its contention that Local 310 is not entitled to the injunctive relief it seeks.  Specifically, Roma's actions while working on UH's construction projects have been wholly in-line with the PLA.  Furthermore, as of this Brief, Roma has completed the project about which Local 310 complains and seeks to enjoin.  Finally, Roma's future involvement on UH's construction projects will be

in a capacity that Local 310 agrees does not violate the PLA and does not require it to become a signatory to Local 310's Trade Agreement.

Thus, Local 310's claim for equitable relief must be denied because: it cannot demonstrate likelihood of success on the merits; it has suffered no irreparable harm; and/or this matter is moot.

## II.  RELEVANT FACTS

### A.  The Project Labor Agreement

On December 1, 2007, UH and the Council entered into the PLA, an overarching agreement entered into to aid UH in meeting certain societal, diversity, and regionalism goals within the Northeastern Ohio area.  (Deposition of John Kilbane (hereinafter, "Kilbane Dep.") Ex. 1, December 14, 2009.)[1]  In practice, the PLA serves the purpose of avoiding labor disputes between the Council, its member Unions, and the contractors on UH's various construction projects by ensuring that all work performed under the PLA is Union work.  (Id. at 32, Ex. 1.) The PLA also governs UH's multi-hundred-million dollar construction project, Vision 2010, pursuant to which UH is building several new hospitals and facilities.

### B.  General Background Regarding Roma

Roma is a small minority business enterprise that was formed in 2004 that provides carpentry services on various construction projects throughout Northeastern Ohio.  (Deposition of Garlin Farris (hereinafter "Farris Dep.") 7, December 14, 2009.)  Roma has two members, Garlin Farris, chief executive officer and president, and Perry Williams, chief financial officer and vice president, and employs approximately ten carpenters.  (Farris Dep. 5-8, 49.)  Roma began work on one of UH's Vision 2010 projects when it  signed a subcontracting agreement with Industrial First ("Industrial") to provide "wood blocking" for Industrial at UH's Case Comprehensive

---

[1] All relevant portions of the depositions cited to herein are attached as Exhibit 1.

Cancer Center (the "Cancer Center").  (Farris Dep. Ex. 2, 37, 68.)  Because Roma employs carpenters, it is a signatory to the carpenters' Trade Agreement.  (Farris Dep. 36.) As to other Trade Agreements, Roma has made a business- and financial-based decision not to become a signatory to any other Trade Agreements due to the increased costs, such as administrative costs and fringe benefits contributions, associated with becoming a signatory to other trades' Trade Agreements.  (Farris Dep. 58-60.)

### C.  Roma's Work at UH's Cancer Center – the Subject of this Lawsuit

Roma began construction-related activities on the Cancer Center on or about July 13, 2009 and completed its work in or around late-September or early-October 2009.  (Farris Dep. 68, Ex. 2.)  While working at the Cancer Center, Roma was a subcontractor to Industrial, a roofing contractor.  (Id. at 54-55, Ex. 2.)  Pursuant to Roma's contract with Industrial, Roma self performed carpentry work.  (Id. at 21, 37, 72.)  It is undisputed that Roma did not self perform any work customarily requiring the employment of an individual represented by Local 310 ("laborers' work") at the Cancer Center.[2]  (Id. at 71, 78; Kilbane Dep. 8.)  Admittedly, Roma was unable to self perform any laborers work specifically **because it was not a signatory to Local 310's Trade Agreement**.  (Kilbane Dep. 14-15 (Q. *** [I]f Roma doesn't sign onto the Local 310 agreement, it cannot have its employees performing Local 310 work on the UH project, correct?  A. Yes.").)  Thus, it subcontracted all laborers' work at the Cancer Center to Burkshire Construction ("Burkshire"), a signatory to the Local 310 Trade Agreement, which then performed all of Roma's laborers' work at the Cancer Center.  (Farris Dep. 55, 70-71.)  Because Burkshire is a signatory to Local 310's Trade Agreement, it is undisputed that Local 310

---

[2] In relation to Roma's work at the Cancer Center, work customarily requiring the employment of an individual represented by Local 310, or Laborers' Work, refers to a laborers' "tending" to a carpenter, e.g., stockpiling materials, cleaning and maintaining a carpenters' worksite, or stripping of forms.  (Farris Dep. 28-30.)  Thus, while performing work under the Industrial contract, Roma's carpenters could not "tend" to themselves, as that was the work of laborers.

received all wages and fringe benefits due for its members that were employed by Burkshire and working pursuant to Roma's contract with Industrial.  (Kilbane Dep. 9, 12.)  Further, it is undisputed that all work performed under Roma's contract with Industrial was performed by Union labor.  (Farris Dep. 72.)

### D.  **Roma's Planned Work at UH's Ahuja Medical Center**

In addition to its already-completed work on the Cancer Center, Roma has successfully bid for work beginning in February 2010 on UH's Ahuja Medical Center ("Ahuja").  (Farris Dep. 42-43, 69, Ex. 3.)  Unlike at the Cancer Center, at Ajuha, Roma will be a prime contractor. (Farris Dep. 43-43, 72-73, 75, Ex. 3.)  As a prime contractor, Roma will not self perform **any** work at Ahuja, but will instead subcontract the various trades' work under its prime contract and then manage those subcontracts.  (Id.)  Notably, Local 310 agrees that, as a prime contractor at Ahuja, Roma need not become a signatory to the Local 310 Trade Agreement:

> Q.  So say that in February of 2010, Roma comes to the Ahuja project . . . [a]s a prime contractor with no actual self-performing of work, only a management employee on site, is . . . [it] required to sign any of the trade agreements?
>
> A.  He would not be. *** If they are not self-performing our work, I have no issue.

(Kilbane Dep. 19-20.)

### E.  **The Present Dispute Involving the PLA**

It is Local 310's position that all subcontractors self performing laborers' work must become signatories to Local 310's Trade Agreement.  (Local 310's Brief in Support of Motion for Temporary Restraining Order, Preliminary Injunction, and Immediate Judicial Relief 3 ("Brief in Support, attached hereto as Exhibit 2.)  Defendants UH and Roma do not necessarily disagree, but posit that a subcontractor that is not capable of self performing work that customarily requires the employment of laborers represented by Local 310 need not become a signatory to

4

Local 310's Trade Agreement, as it may further subcontract that work to another entity that is a signatory to the Local 310 Trade Agreement.  Thus, it is Roma's ability to "self perform" that is at issue.

As to the PLA, two paragraphs are pertinent to this matter.  Paragraph 6 provides:

> UH may contract with one or more construction managers, who shall be entitled, as agent(s) for UH, to enforce any and all of UH's rights under this Agreement. Such construction managers shall be required to acknowledge and execute this Agreement.  UH and its construction managers agree that to the extent that a Contractor **is able to perform the work that it is awarded**[,] it shall self-perform such work and shall not subcontract such work to any other Contractor.

(Kilbane Dep. Ex. 1 at ¶ 6 (emphasis added).)

And Paragraph 19 of the PLA provides:

> It is agreed that except as otherwise herein expressly provided, UH will require all Contractors working on the Covered Projects to be party to Trade Agreements with the appropriate member Unions and to the extent that the terms thereof are not inconsistent with this Agreement.

(Id. at ¶ 19.)  These two paragraphs may be read together to state the following:  Any contractor awarded work pursuant to the PLA, which is capable of self-performing the awarded work, must become a party to Trade Agreements with the appropriate member Unions.  (See id. at ¶¶ 6, 19.)

All parties, however, agree that a prime contractor that is not self performing work on a UH project under the PLA is not required to become a signatory to Local 310's Trade Agreement. (Kilbane Dep. 19-20.)

### III.  LEGAL ANALYSIS

As Local 310 correctly points out in its Brief in Support, in determining whether this Court should issue a temporary restraining order or preliminary injunction, four factors are considered: (1) whether Plaintiff has shown a strong or substantial likelihood or probability of success on the merits; (2) whether Plaintiff has shown irreparable injury will result if the

preliminary injunction is not granted; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether issuing a preliminary injunction would serve the public interest.  Washington v. Reno, 35 F.3d 1093, 1099 (6th Cir. 1994).  Because Local 310 can make no such showing, its claim for temporary injunctive relief should be dismissed.

### A.  Local 310 Cannot Demonstrate a Probability of Success on the Merits Because Roma Need Not Become a Signatory to Local 310's CBA Under the Language of the PLA.

Nothing in the plain text of the PLA prohibits a subcontractor that is incapable of self performing work awarded to it from further subcontracting that work, or a portion of that work, without becoming a party to any Trade Agreements, so long as the final subcontractor performing the work is a party to the relevant Trade Agreements.

In interpreting labor contracts, courts must: 1) "look to the explicit language;" 2) evaluate that language "in light of the context" that led to its use; 3) "interpret each provision . . . as part of the integrated whole;" 4) construe each provision "consistently with the entire document and the relative positions and purposes of the parties;" 5) construe the terms "so as to render none nugatory" and to "avoid illusory promises;" 6) look to other words and phrases in the document to resolve ambiguities; and 7) "review the interpretation . . . for consistency with federal labor policy."  UAW v. Yard-Man, 716 F.3d 1476, 1479-80 (6th Cir. 1983).  General principles of contract interpretation should "guide a district court's interpretation of the explicit language." Id. at 1479.  Finally, when a contractual provision is unambiguous, the court may not turn to extrinsic evidence.  UAW v. BVR Liquidating, Inc., 190 F.3d 768, 774 (6th Cir. 1999).

Paragraph 6 of the PLA lays the foundation of this proposition, stating, "to the extent that a Contractor **is able to perform the work** that it is awarded[,] it shall self-perform such work and shall not subcontract such work to any other Contractor."  (Kilbane Dep. Ex. 1 ¶ 6 (emphasis

6

added).)   This provision ensures that contractors fully capable of performing work awarded under the PLA cannot continually subcontract work to the cheapest possible subcontractor while taking a profit.   Next, Paragraph 19 states that these "Contractors" that are capable of self performing the work they are awarded pursuant to Paragraph 6 must become signatories to the relevant Trade Agreements governing the various trade work necessary under their contracts. (Id. at ¶ 19.)   As stated, when read together, these paragraphs explicitly state that only a contractor awarded work pursuant to the PLA that is **capable** of self-performing the awarded work must become a party to Trade Agreements with the appropriate member Unions.   (See Id. at ¶¶ 6, 19.)   Thus, nothing in this language bars a contractor awarded work under the PLA that cannot self perform that work from subcontracting it pursuant to Paragraph 6.

Within the PLA's plain meaning, Roma's actions in subcontracting work to Burkshire were in accordance with the PLA's provisions.  As agreed by Local 310, **Roma was not capable of self performing** the laborers' work awarded to it by Industrial because Roma was not a party to Local 310's Trade Agreement and, thus, its employees could not perform laborers' work. Unable to perform the work itself, Roma subcontracted the laborers' work to Burkshire pursuant to Paragraph 6.  And, in accordance with Paragraph 19, Burkshire, being a signatory to the Local 310 Trade Agreement and thus capable of performing laborers' work, performed the laborers' work awarded to it by Roma.  Under the facts as stated, Roma was not required to be a signatory to Local 310's trade agreement because it could not self perform the work awarded to it by Industrial, and its actions in subcontracting its laborers' work were in line with the PLA.

Put simply, Local 310 has not demonstrated a likelihood of success on the merits because its interpretation of provision of the PLA relevant to this matter is contrary to the plain meaning of the PLA.  Thus, its request for injunctive relief must be denied.

**B.  Local 310 Has Suffered No Irreparable Injury.**

    **1.  All Laborers' Work Was Performed with Local 310 Labor and Local 310 Received All of Its Wages And Fringe Benefits.**

In support of its claim of irreparable harm, Local 310 states:

> Each day, Roma moves closer to completing [its] construction agreements without employment of laborers represented by Local No. 310 . . . [and] no amount of money can compensate for the loss of opportunity to represent employees and to assure that the work is performed pursuant to the Local 310 Trade Agreement.

(Brief in Support 5-6.)  But, as Local 310 admitted, all laborers' work performed under Roma's subcontract with Industrial was performed by Local 310's members, Local 310 received all the wages and fringe benefits for that work, and all laborers' work performed was performed pursuant to the Local 310 Trade Agreement.  Plainly, Local 310 has suffered no injury, let alone one that can be categorized as "irreparable."

       To this end, at deposition, Local 310 could not articulate any damage it has actually suffered by virtue of Roma's actions.  Rather, its representative conjectured about "disincentives" and "potential" damages.  (Kilbane Dep.  11-13 (stating that use of subcontractors like Burkshire, who charge a higher hourly rate for laborer's work than required by Local 310, is a disincentive to Roma to hire Local 310 members and that while Local 310 has no evidence of damages, "potential existed").)  These sorts of speculative, non-provable damage claims are insufficient to prove that Local 310 has suffered any injury, let alone an irreparable one.  Thus, Local 310's request for injunctive relief should be denied.

    **2.  This Case is Moot Because Roma Has Completed its Work on the Cancer Center and all of its Future Work on UH Projects Will be Performed as a Prime Contractor.**

       A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  League of Women Voters of Ohio v. Brunner, 548

F.3d 463, 476 (6th Cir. 2008) (citing <u>L.A. County v. Davis</u>, 440 U.S. 625, 631 (1979)). Mootness implicates Article III's case or controversy requirement and can be asserted at any stage of the litigation.  <u>Id.</u>  The above-stated facts clearly demonstrate that there no longer exists a live controversy between Roma and Local 310.

First, the alleged conduct about which Local 310 complains, Roma's work on the Cancer Center, ended over three months ago in October 2009.  (Farris Dep. 68, Ex. 2.)  Thus, this Court cannot grant relief to Local 310, as it cannot enjoin Roma from performing work that is already completed.

Second, Local 310 admits that Roma's future work on UH's projects under the PLA does not require Roma to become a signatory to the Local 310 Trade Agreement.  (Kilbane Dep. 19-20.)  Therefore, no relief is due to Local 310 because it is admittedly not going to suffer any harm as a result of Roma's future actions.

Thus, because Roma is not currently engaged in, nor is it contracted to engage in, any work requiring it to become a signatory to the Local 310 Trade Agreement, there is no "live" controversy between the parties because Local 310 has not suffered an injury nor is it in danger of suffering an injury by virtue of Roma's actions.  Therefore, this matter is moot, and Local 310's request for injunctive relief should be denied.

C. <u>UH and Roma Will Be Disproportionately Harmed by a Grant of Injunctive Relief.</u>

Local 310's argument that Roma will not be harmed by this Court's grant of injunctive relief because Roma "cannot demonstrate harm when ordered to comply with its explicit contractual duties" is disingenuous and ignores the ramifications of enjoining even one contractor on a construction project the size of Vision 2010.  Roma will indeed be harmed if this Court were to grant injunctive relief because it is in compliance with the PLA, as shown in Section A, <u>supra</u>.

Simply put, Roma has fully complied with the PLA, even paying over the standard hourly rate for Laborers, in an attempt to ensure that Local 310's members performed work traditionally requiring laborers' under its contract with Industrial.  Thus, awarding relief to Local 310 will cause irreparable harm to Roma because Roma, at all relevant times, acted in accordance in accordance with the PLA, and the injunction would act to punish an innocent party.

Additionally, this Court's acceptance of Local 310's interpretation of the PLA would have ramifications beyond Roma.  Specifically, this Court's enjoining of Roma's work at Ahuja will cause construction delays on that project, where Roma is slated to act as a general contractor. This interruption of Roma's duties will then reverberate, causing delays and other issues with the subcontractors performing work under Roma, further delaying Ahuja.

As a corollary to the above, this Court's injunction of Roma's future work will also cause irreparable harm to UH.  In fact, it is for this very reason UH intervened in this matter in the first place.  UH has an important interest in the smooth and timely performance of construction work on its Vision 2010 projects, and the PLA was designed and implemented solely to avoid situations like this one – a Union's impeding construction in contravention of the clear language and spirit of the PLA.  Granting Local 310's requested relief could, as stated above, cause a cascade of problems and delays with UH's Ahuja project, starting with Roma and its subcontractors.

When the above-stated harms to Roma, its subcontractors, and UH are balanced against the facts that Roma will not be performing services at Ahuja that require it to become a signatory to the Local 310 Trade Agreement, that Local 310 received all wages and fringe benefits for members under Industrial's contract with Roma at the Cancer Center, and that, at all times,

Roma has utilized Local 310 members for all laborers' work, it is clear that the equities weigh heavily in favor of this Court's denial of Local 310's request for injunctive relief.

## IV. **CONCLUSION**

Because Local 310 cannot demonstrate a likelihood of success on the merits or that it has suffered any irreparable harm and because granting its requested equitable relief will disproportionately harm UH, Roma, and the other contractors on the Ahuja project, Local 310's requested injunctive relief should be denied and its Verified Complaint dismissed.

Respectfully submitted,

/s/ Charles F. Billington III
David A. Campbell (0066494)
Charles F. Billington III (0083143)
Elizabeth A. Davis (0082186)
Vorys, Sater, Seymour and Pease LLP
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, Ohio  44114-1724
Phone (216) 479-6100
Fax: (216) 479-6060
Email:  dacampbell@vorys.com
          cfbillington@vorys.com
          eadavis@vorys.com

*Attorneys for Defendant/Intervenor University Hospitals Health System, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was sent via the Court's electronic filing system to all parties of record with the Court on the date of filing.  Notice of this filing will be served to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Charles F. Billington III
Vorys, Sater, Seymour and Pease LLP
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, Ohio  44114-1724
Phone (216) 479-6100
Fax: (216) 479-6060
Email: cfbillington@vorys.com

*One of the Attorneys for*
*Defendant/Intervenor University Hospitals*
*Health System, Inc.*